| | | |
|---|---|---|
| LARRY PATTERSON, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | Case No. _____ |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| v. | ) ) ) | CLASS ACTION COMPLAINT FOR: |
| RUBY TUESDAY, INC., STEPHEN I. SADOVE, JAMES F. HYATT, II, F. LANE CARDWELL, JR., MARK W. ADDICKS, KEVIN T. CLAYTON, DONALD E. HESS, BERNARD LANIGAN, JR., JEFFREY J. O'NEILL, RTI HOLDING COMPANY, LLC, and RTI MERGER SUB, LLC. | ) ) ) ) ) ) ) ) ) ) | (1)   Violation of § 14(a) of the Securities Exchange Act of 1934<br><br>(2)   Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>(3)   Breach of Fiduciary Duties |
| Defendants. | ) ) | DEMAND FOR JURY TRIAL |

Plaintiff Larry Patterson ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

**<u>SUMMARY OF THE ACTION</u>**

1.     Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of Ruby Tuesday, Inc. ("Ruby Tuesday" or the "Company"), against Ruby Tuesday, and the Company's Board of Directors (the "Board" or the "Individual Defendants) for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and for breaches of fiduciary duty as a result of Defendants' efforts to sell the Company as a result of an unfair process for an unfair price. Also named as defendants are of RTI Holding Company, LLC ("Parent") and RTI Merger Sub, Inc. ("Merger Sub"), both of which are affiliates of the Atlanta based private equity firm of NRD Capital Management, LLC (collectively with Parent and Merger Sub "NRD"). This action seeks to enjoin a stockholder vote currently scheduled to take place during the

first quarter of 2018, in which NRD, through its affiliates, will acquire each outstanding share of Ruby Tuesday common stock for $2.40 per share in cash with a total valuation of approximately $335 million (the "Proposed Acquisition").

2.     The terms of the Proposed Acquisition were initially memorialized in an October 16, 2017 filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching an Agreement and Plan of Merger.

3.     On October 31, 2017, Ruby Tuesday's filed a Preliminary Proxy Statement on Schedule Prem14A with the Securities and Exchange Commission (the "SEC") in support of the Proposed Acquisition (the "Proxy").

4.     Defendants breached their fiduciary duties to the Company's stockholders by agreeing to the Proposed Acquisition which undervalues Ruby Tuesday and is the result of a flawed sales process.  Post-closure, Ruby Tuesday's stockholders will be frozen out of seeing the return on their investment of any and all future profitability of Ruby Tuesday.

5.     Notably, as evidenced by the Proxy, the sales process leading up to the Proposed Acquisition was rife with inadequacies, including no less than two activist stockholders urging the Board to sell the Company with at least one publicly threatening a proxy fight.

6.     Further, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Acquisition, Company Board Members and executive officers will be able to exchange large, illiquid blocks of Company stock for massive payouts, in addition to receiving cash in exchange for certain outstanding and unvested options and/or other types of restricted stock units. Moreover, certain Directors and other insiders will also be the recipients of lucrative change-in-control agreements, triggered upon the termination of their employment as a consequence of the consummation of the Proposed Acquisition.  Such large paydays upon the consummation of the Proposed Acquisition, have clearly tainted the motivations of the Board in approving it.

7.     Finally, in violation of sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and their fiduciary duties, Defendants caused to be filed the materially

CLASS ACTION COMPLAINT

deficient Proxy on October 31, 2017 with the SEC in an effort to solicit stockholders to vote their Ruby Tuesday's shares in favor of the Proposed Acquisition. The Proxy is materially deficient and deprives Ruby Tuesday stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote their shares in favor of the Proposed Acquisition. As detailed below, the Proxy omits and/or misrepresents material information concerning, among other things: (a) the Company's financial projections; (b) the sales process of the Company; and (b) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisor UBS Investment Bank ("UBS"); and (c) the financial analyses performed by UBS in support of the Proposed Acquisition.

8. Absent judicial intervention, the merger will be consummated, resulting in irreparable injury to Plaintiff and the Class. This action seeks to enjoin the Proposed Acquisition or, in the event the Proposed Acquisition is consummated, to recover damages resulting from violation of the federal securities laws by Defendants.

## PARTIES

9. Plaintiff is an individual citizen of the State of North Carolina. He is, and at all times relevant hereto, has been a Ruby Tuesday stockholder.

10. Defendant Ruby Tuesday is a Georgia corporation and maintains its principal executive offices at 333 East Broadway Avenue, Maryville, Tennessee, 37804. Ruby Tuesdsay's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "RT".

11. Defendant Stephen I. Sandove ("Sandove") has served at all relevant times as a director of Ruby Tuesday. In addition, Sandove serves as the Chairman of the Company Board.

12. Defendant James F. Hyatt, II ("Hyatt") has served at all relevant times as a director of Ruby Tuesday. In addition, Hyatt serves as the President and Chief Executive Officer ("CEO") of the Company.

CLASS ACTION COMPLAINT

13.     Defendant F. Lane Cardwell, Jr. ("Cardwell") has served at all relevant times as a director of Ruby Tuesday. In addition, Cardwell previously served as interim President and CEO of the Company.

14.     Defendant Mark W. Addicks ("Addicks") has served at all relevant times as a director of Ruby Tuesday.

15.     Defendant Kevin T. Clayton ("Clayton") has served at all relevant times as a director of Ruby Tuesday.

16.     Defendant Donald E. Hess ("Hess") has served at all relevant times as a director of Ruby Tuesday.

17.     Defendant Bernard Lanigan, Jr. ("Lanigan") has served at all relevant times as a director of Ruby Tuesday.

18.     Defendant Jeffrey J. O'Neill ("O'Neill") has served at all relevant times as a director of Ruby Tuesday.

19.     The defendants identified in paragraphs 11 through 18 are collectively referred to herein as the "Director Defendants" or the "Individual Defendants."

20.     Defendant Parent is a Delaware Limited Liability Company and party to eh Merger Agreement that maintains its principal place of business at 4170 Ashford Dunwoody Road, #390, Atlanta GA, 30319. Parent is a privately-owned LLC, affiliated with NRD.

21.     Defendant Merger Sub is a Georgia Limited Liability Company and a party to the Merger Agreement that maintains its principal place of business at 4170 Ashford Dunwoody Road, #390, Atlanta GA, 30319. Parent is a privately-owned LLC, affiliated with NRD.

22.     Non-Party NRD is a Delaware Limited Liability Company that maintains its principal place of business at 4170 Ashford Dunwoody Road, #390, Atlanta GA, 30319. NRD exercises control over its affiliates Parent and Merger Sub.

**JURISDICTION AND VENUE**

23.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act

- 4 -

CLASS ACTION COMPLAINT

(15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and Section 20(a) of the Exchange Act. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have. The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

24. Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

25. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Ruby Tuesday is headquartered in this District and a many of the events giving rise to the claims herein took place in this District. Further, each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

26. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Ruby Tuesday's common stock who are being and will be harmed by Defendants' actions described herein (the "Class"). The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

27. This action is properly maintainable as a class action because:

a. The Class is so numerous that joinder of all members is impracticable. According to the Company's most recent 10-Q, as of October 9, 2017, there were more than 61.1 million common shares of Ruby Tuesday stock outstanding. The actual number of public stockholders of Ruby Tuesday will be ascertained through discovery;

CLASS ACTION COMPLAINT

b.　　There are questions of law and fact which are common to the Class, including *inter alia*, the following:

　　i.　　Whether Defendants have violated the federal securities laws;

　　ii.　　Whether Defendants made material misrepresentations and/or omitted material facts in the Proxy;

　　iii.　　Whether Defendants have breached their fiduciary duties; and

　　iv.　　Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Acquisition is consummated.

c.　　Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d.　　Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.　　The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

f.　　Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

g.　　Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

- 6 -

CLASS ACTION COMPLAINT

## THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES

28.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Ruby Tuesday's and owe the Company the duties of due care, loyalty, and good faith.

29.     By virtue of their positions as directors and/or officers of Ruby Tuesday, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Ruby Tuesday to engage in the practices complained of herein.

30.     Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors of a corporation must:

> a.     act with the requisite diligence and due care that is reasonable under the circumstances;
>
> b.     act in the best interest of the company;
>
> c.     use reasonable means to obtain material information relating to a given action or decision;
>
> d.     refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;
>
> e.     avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and
>
> f.     disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

31.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Ruby Tuesday, are obligated to refrain from:

- 7 -

CLASS ACTION COMPLAINT

     a.     participating in any transaction where the directors' or officers' loyalties are divided;

     b.     participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders; and/or

     c.     unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders.

32.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition, violated, and are violating, the fiduciary duties they owe to Ruby Tuesday, Plaintiff and the other public stockholders of Ruby Tuesday's, including their duties of loyalty, good faith, and due care.

33.     As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Ruby Tuesday's common stock in the Proposed Acquisition.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

34.     Ruby Tuesday, together with its subsidiaries, engages in the ownership, development, operation, and franchise of casual dining restaurants under the Ruby Tuesday name in the United States and internationally. As of June 6, 2017, the company owned and operated 543 Ruby Tuesday restaurants and 62 franchised Ruby Tuesday restaurants in 41 states, Guam, and internationally.

35.     Ruby Tuesday's stock had shown (and continues to show) sustained solid financial performance, including in the time leading up to the entry into the original merger agreement. For example, in on an October 16, 2017, press release announcing the Company's financial results for Q1 of the 2018 fiscal year (which was released concurrently with the press release announcing the Proposed Acquisition), the Company reported that such positive results as an increase in adjusted EBITDA from $4.9 million to $13.3 million year-on-year.

- 8 -

CLASS ACTION COMPLAINT

36.     These positive financial results are not an anomaly, but rather, are indicative of a trend of continued financial success by Ruby Tuesday.  Looking further back, one can see evidence for this typical success.  For example, in an August 21, 2017 press release announcing the Company's Q4 Fiscal 2017 financial results, Ruby Tuesday reported such highlights as a Q4 net loss of $8.7 million compared to a net loss of $27.6 million year-on-year, showing significant improvement in implementing the Company's "Plan to Win" to "address sales and operation challenges, improve financial profitability, and thereby enhance long-term value for shareholders."

37.     Despite this upward trajectory and improvements made in line with the "Plan to Win", the Individual Defendants have caused Ruby Tuesday to enter into the Proposed Acquisition, thereby depriving Plaintiff and other public stockholders of the Company the opportunity to reap the benefits of Ruby Tuesday present and future success.

*The Flawed Sales Process*

38.     The process deployed by the Individual Defendants was flawed and inadequate, and conducted out of the self-interest of the Individual Defendants.

39.     In fact, the Proposed Acquisition was not the result of a sales process at all, but was originated in September 2016, with NRD sending Ruby Tuesday a letter of intent, stating its interest in an acquisition of Ruby Tuesday at a price of $3.50 per share and requested a 60-day exclusivity period.  While Ruby Tuesday neglected to pursue this overture at the time, it is clear that NRD sought to weed out any idea of a true sales process from the inception of any talks with the Company.

40.     On November 14, 2016, Engaged Capital LLC ("Engaged Capital") filed a Schedule 13F with the SEC disclosing that, as of September 30, 2016, it held approximately 3.3% of the outstanding shares of Ruby Tuesday common stock.  Such announcement led to discussions taking place between the Company and Engaged Capital throughout November and December 2016 relating to various Company matters, including the estimated value of Ruby Tuesday's real estate assets.

41.     On January 11, 2017, NRD sent a follow up letter to Ruby Tuesday reiterating its desire to enter into a strategic transaction with the Company at a price of $3.50 per share.  Thereafter,

- 9 -

CLASS ACTION COMPLAINT

on January 18, 2017, after discussions with UBS, the Company determined to allow NRD to perform limited due diligence of Ruby Tuesday over a 30-day period, without exclusivity and with the expectation that NRD would provide an improved offer containing an enhanced price proposal and financing arrangements to Ruby Tuesday.

42.     Subsequently the Company and NRD entered into a confidentiality agreement dated January 25, 2017 with a customary standstill provision, and Ruby Tuesday provided certain non-public due diligence information to NRD.  The Proxy is silent as to what conditions, if any, would cause the standstill provision to fall-away.

43.     On January 23, 2017, UBS provided to Ruby Tuesday a letter disclosing certain aspects of its investment banking relationships with Ruby Tuesday and NRD, however the Proxy is silent as to the exact nature of these disclosures.  The Company would later execute an engagement letter with UBS on March 3, 2017.

44.     On February 13, 2017, the Company Board met with its legal and financial advisors to discuss the Company's valuation and possible future strategic options.  While other possible strategic alternatives were discussed in addition to discussions with NRD, no third-party outreach was contemplated or initiated at this time.

45.     On February 27, 2017, NRD indicated to Ruby Tuesdays that it was still interested in a possible strategic transaction but that it was lowering its price range to $2.50 to $3.00 per share.  In response, the Company indicated that it was disappointed with the price drop, and informed NRD that it would make a public announcement regarding the Company's review of strategic alternatives.

46.     However, after NRD's financial advisor requested that the Company delay its public announcement, the Company agreed to delay such announcement to allow NRD to make a preemptive offer.  The Company indicated that NRD would need to submit such an offer by March 9, 2017, and that it would need to meet certain criteria.

47.     On March 9, 2017, NRD submitted to the Company a revised offer at $2.51 per share. NRD also indicated it had obtained $280 million in financing, in addition to equity commitments of

- 10 -

CLASS ACTION COMPLAINT

$95 million from affiliated funds, but the Proxy indicates that NRD was unwilling to provide written copies of such financing letters to Ruby Tuesday prior to a commitment to move forward in a transaction process.

48.     After discussion amongst the Ruby Tuesday board determine that the March 9, 2017, NRD offer presented a large amount of risk, the Company decided to move forward with a public press release.  At this meeting, the Board and UBS discussed the Company's valuation based on revised financial projections provide by Company management on March 7, 2017, which contained projections that were further revised down from the previous financial plan provided on February 6, 2017.

49.     On March 13, 2017, the Company issued a press release indicating that it was considering strategic alternatives.  Thereafter UBS engaged in preliminary discussions with a total of 47 parties (including four parties who would enter the process later in May 2017) regarding a potential acquisition of the Company or its real estate assets.   The Company entered into confidentiality agreements with a total of 23 of these parties, all of which included customary standstill provision prohibiting, among other things, the counterparty from acquiring shares of Company stock and waging a proxy contest or other stockholder activism campaign.  The Proxy is silent as to the whether and under what conditions such standstill conditions would fall-away, or in what ways these confidentiality agreements differed from each other or with the agreement between the Company and NRD.

50.     On March 23, 2017, NRD indicated that it was still interested in a potential transaction and would be shortly submitting an updated bid.

51.     Also on March 23, 2017, Leon Capital Partners, LLC ("Leon") informed UBS that it anticipated filing a Schedule 13D with the SEC disclosing that it had acquired approximately 9% of the outstanding shares of the Company on the open market since the March 13, 2017 strategic alternatives announcement.  Leon informed UBS that it was very interested in participating in the sale process, and entered into a confidentiality agreement with Ruby Tuesday on the same day, which

CLASS ACTION COMPLAINT

contained a customary standstill provision. The proxy is silent as to what conditions, if any, would cause this standstill provision to fall-away or if the confidentiality agreement differed in any away from the previous entered into by the Company.

52. Beginning in late March 2017, the Company sent letters to 19 parties with instructions to submit first round bids by April 13, 2017.

53. On April 13 ad 14, 2017, the Company received preliminary non-binding indications of interest from nine parties, resulting in a total of ten bids including NRD's previously submitted proposal. Five parties submitted bids to acquire the entire company for consideration per share ranging from $2.25 to $5.75. Other parties submitted bids that included proposals to acquire the Company's restaurant business, or provided indications of interest that did not contain per share valuations.

54. On April 17, 2017, the Company determined to move forward with second round bidding with all bidders who submitted first round bids except for "Bidder 5" who had submitted the lowest offer, however Bidder 5 later submitted a second bid for a price between $2.75 - $3.25 per share, which was more in line with other bidders, and invited it to participate in the second round of bidding.

55. On May 16, 2017, "Bidder 11" contacted UBS seeking to participate in the sales process. Thereafter the Company entered into a confidentiality agreement containing customary standstill provisions with Bidder 11, however the Proxy is silent as to if and under what conditions the standstill would fall-away, or the agreements similarities to previous confidentiality agreements entered into by Ruby Tuesday.

56. On June 1, 2017, the Company Board received a letter from Engaged Capital which urged the Board to strongly consider all acquisition offers, which Engaged Capital believed to be the most viable path to realizing the value of Ruby Tuesday's' assets. In addition, Engaged Capital also urged the Board to delay the deadline for stockholders to submit director nominations for the 2017 annual meeting of stockholders until the conclusion of the sales process. In response to this letter, the

- 12 -

CLASS ACTION COMPLAINT

Board indicated that it took its fiduciary duties very seriously and noted that it had not yet set the date or submission deadlines for the 2017 stockholder meeting.

57. On June 8, 2017, NRD submitted a revised proposal to the Board, which contemplated a price of $2.77 per share, and included a request that the Company accept the offer by executing an exclusivity agreement by June 10, 2017, which the Company declined.

58. On June 14, 2017, the Company Board, in reviewing the four submitted second round bids (including NRD's) determined that none were satisfactory, and advised UBS to continue engaging with interested bidders.

59. Parties, including NRD, continued to submit bids during this time period.

60. On June 27, 2017, an article from an unspecified purported stockholder of the Company was published on *Seeking Alpha*. The article expressed impatience with the progress of the Company Board's review of strategic alternatives, urged the board to consider all the bids received, and asked the Board to extend the nominating window for directors until the strategic alternatives review was completed and threated a proxy contest if such extension request was not honored.

61. After a meeting on July 3, 2017, the Company Board determined to continue to work with interested bidders to work on two parallel option of either a sale of the company or a sale-leaseback proposal which would not result in a sale.

62. On July 6, 2017, the Board through UBS delivered to the remaining bidders, NRD, "Bidder 2", and Bidder 11, stating that July 12, 2017 was the deadline for final bids and providing a willingness to engage with the prevailing bidder on an exclusive basis. Thereafter all three parties submitted bids.

63. On July 19, 2017, the Company determined to (i) engage with NRD on an exclusive basis in connection with a change-in-control transaction and (ii) to continue discussions with "Bidder 8" in connection with a potential standalone sale-leaseback transaction.

- 13 -

CLASS ACTION COMPLAINT

64.     From mid-July through August 14, 2017, legal advisors for NRD and the Company engaged in negotiations regarding the terms of a no-shop agreement, merger agreement, and related documentation.

65.     On July 20, 2017, the Board received a letter form Leon urging the Board to consider a sale-leaseback of certain real estate assets as a possible strategic alternative.

66.     After discussion regarding, among other things, NRD and Bidder 8's bid, the Board on August 14, 2017, informed Bidders 8 and 11 that it was entering into exclusivity with another bidder, and agreed to waive Bidder 8 and 11's obligation under the standstill provisions of their respective confidentiality agreements to the extent necessary to permit each such party to continue to submit unsolicited confidential proposals to the Company.

67.     Also on August 14, 2017, the Company entered into a 'No-Shop' agreement with NRD, which prohibited the Company from soliciting, discussing or negotiating, or entering into an agreement relating to, an alternative change-of-control acquisition proposal with a third party for 30 days, which was extendable to 45 days.

68.     Throughout August, September and October 2017, NRD, the Company and their advisors discussed the terms of a proposed strategic transaction.

69.     On October 16, 2017, after a Board Meeting in which the Board approved the form of the proposed merger agreement, the Proposed Acquisition was entered into and announced to the public.

***The Proposed Acquisition***

70.     The Company and NRD announced the Proposed Acquisition via joint press release on October 16, 2017.  The press release states in relevant part:

> **Maryville, TN – October 16, 2017 –** Ruby Tuesday, Inc. (NYSE: RT) today announced an agreement to be acquired by a fund managed by NRD Capital ("NRD"), an Atlanta-based private equity firm that specializes in franchised and multi-location business investments.
>
> Under the terms of the agreement, NRD will acquire all of Ruby Tuesday's common stock for $2.40 per share in cash and will assume or retire all debt obligations for a

- 14 -

CLASS ACTION COMPLAINT

total enterprise value of approximately $335 million, excluding transaction expense. The purchase price represents a premium of approximately 37% over Ruby Tuesday's closing share price on March 13, 2017, the day before the Company announced its intention to explore strategic alternatives, and a premium of approximately 21% over Ruby Tuesday's closing share price on October 13, 2017.

"The Board of Directors and our advisors have thoroughly evaluated all options available to the Company and are confident that this agreement will provide the most promising opportunity to realize the highest value for our stockholders while providing the best path forward for the Ruby Tuesday brand, its employees, franchisees, and loyal customers," said Stephen Sadove, Non-executive Chairman of Ruby Tuesday. "NRD Capital has a distinguished track record of achieving and maintaining profitable growth for restaurant concepts and will be an excellent partner to lead Ruby Tuesday going forward."

The transaction has been unanimously approved by Ruby Tuesday's Board of Directors and NRD and is subject to shareholder approval and other customary closing conditions. The acquisition is expected to be completed during the first calendar quarter of 2018. UBS Investment Bank is serving as financial advisor to Ruby Tuesday and provided a fairness opinion to the Ruby Tuesday Board of Directors.

"Our focus at NRD is investing in quality restaurant companies and providing strategic and operational expertise to create sustainable value. With a well-established brand, differentiated from other casual dining restaurants by its Garden Bar, we see significant opportunities to drive value for Ruby Tuesday," said Aziz Hashim, founder of NRD. "We are excited to be part of the Company's next chapter. As a private company, we will be able to take a long-term view on Ruby Tuesday, allowing us to make an investments in people, product, and customer experience, without public company constraints. This approach will enable us to reward everyone involved in our success, in addition to our investors."

Davis Polk is serving as legal advisor to Ruby Tuesday. Cheng Cohen is serving as legal advisor to NRD and Arlington Capital Advisors is serving as financial advisor to NRD.

About Ruby Tuesday, Inc.

Ruby Tuesday, Inc. owns and franchises Ruby Tuesday brand restaurants. As of September 5, 2017, there were 599 Ruby Tuesday restaurants in 41 states, 14 foreign countries, and Guam. Of those restaurants, we owned and operated 541 Ruby Tuesday restaurants and franchised 58 Ruby Tuesday restaurants, comprised of 17 domestic and 41 international restaurants. Our Company-owned and operated restaurants are concentrated primarily in the Southeast, Northeast, Mid-Atlantic, and Midwest of the United States, which we consider to be our core markets. For more information about

- 15 -

Ruby Tuesday, please visit www.rubytuesday.com. Ruby Tuesday, Inc. is traded on the New York Stock Exchange (Symbol: RT).

About NRD Capital

NRD Capital invests in brands that offer superior products or services and compelling unit-level economics in order to help them strategically grow through the power of franchising. The fund was founded in 2014 by Aziz Hashim, one of the world's leading experts on franchising, with the goal of leveraging operational and financial experience to position high quality brands for accelerated but responsible growth. The differentiated private equity fund takes a unique approach to investing, applying operating expertise and leveraging its wide network of franchisees, in addition to infusing capital in its portfolio companies.

***The Inadequate Merger Consideration***

71.     Significantly, analyst expectations, the Company's strong market position, extraordinary growth, synergistic value, and positive future outlook establish the inadequacy of the merger consideration.

72.     First, the compensation afforded under the Proposed Acquisition to Company stockholders significantly undervalues the Company.  The proposed valuation does not adequately reflect the intrinsic value of the Company.  Moreover, the valuation does not adequately take into consideration how the Company is performing, considering increases in revenues reported by the Company in quarters leading up to the original merger announcement.

73.     Significantly, the Company's stock has traded as high as $3.68 within the last fifty-two weeks, a value that is more than ***53.33% higher than that offered in the Proposed Acquisition***.

74.     Obviously, the opportunity to invest in such Company with a history of continued success is valuable to NRD, however it undercuts the foresight and investment of Plaintiff and all other public stockholders who have done the same.

75.     Moreover, post-closure, Ruby Tuesday's stockholders will be completely cashed out from any and all ownership interest in the Company, forever foreclosing them from receiving any future benefit in their investment as Ruby Tuesday's continues on its upward financial trajectory.

- 16 -

CLASS ACTION COMPLAINT

76.     Finally, the inadequacy of the Proposed Acquisition has not gone unnoticed by those in the financial media.  For example, in an October 18, 2017, article published on *The Street*, Jonathan Heller categorizes the overall value of the deal as "disappointing".

77.     It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for NRD at the expense of Ruby Tuesday and Ruby Tuesday's stockholders, which clearly indicates that Ruby Tuesday's stockholders were not an overriding concern in the formation of the Proposed Acquisition.

***Preclusive Deal Mechanisms***

78.     The Merger Agreement contains certain provisions that unduly benefit NRD by making an alternative transaction either prohibitively expensive or otherwise impossible. Significantly, the Merger Agreement contains a termination fee provision that requires Ruby Tuesday to pay up to $7.5 million to NRD if the Merger Agreement is terminated under certain circumstances. Moreover, under one circumstance, Ruby Tuesday must pay this termination fee even if it consummates any Acquisition Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.  The termination fee will make the Company that much more expensive to acquire for potential purchasers.  The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

79.     The Merger Agreement also contains a "No Solicitation" provision that restricts Ruby Tuesday from considering alternative acquisition proposals by, *inter alia*, constraining Ruby Tuesday's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited bona fide *"written Acquisition Proposal"* if it constitutes or is reasonably calculated to lead to a *"Superior Proposal"* as defined in the Merger Agreement.

80.     Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, the Individual Defendants agreed to provide NRD information in order to match any other offer, thus providing NRD access to the unsolicited bidder's financial information and giving NRD the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of NRD.

81.     These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and its public stockholders.

82.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Acquisition.

***Potential Conflicts of Interest***

83.     There is strong evidence that the Proposed Acquisition may be tainted by the self-interest of the Company insiders, including members of Company management.  Certain insiders stand to receive massive financial benefits as a result of the Proposed Acquisition, as the large, illiquid chunks of shares currently held by certain Defendants and Company insiders will be exchanged for cash.  For example, upon the consummation of the Proposed Acquisition, Defendant Hyatt, stands to receive over two million dollars from an exchange of his currently owned, illiquid, stock of the Company.

84.     Other Company insiders own large, illiquid portions of Company stock as follows:

| Name | Cash ($)[1] | Equity ($)[2] | Pension/ NQDC ($) | Perquisites/ Benefits ($)[3] | Tax Reimbursement ($) | Total ($) |
|---|---|---|---|---|---|---|
| ***Named Executive Officers*** | | | | | | |
| James F. Hyatt, II, President and Chief Executive Officer | 850,000 | 1,184,374 | 0 | 0 | 0 | 2,034,374 |
| Linda Sue Briley, Chief Financial Officer | 1,134,047 | 283,541 | 0 | 48,235 | 0 | 1,465,823 |
| Michael K. Ellis, Chief Development Officer | 1,110,714 | 273,077 | 0 | 50,946 | 0 | 1,434,737 |
| Rhonda J. Parish, Chief Legal Officer and Secretary | 1,211,557 | 307,838 | 0 | 53,448 | 0 | 1,572,843 |
| Davis W. Skena, Chief Marketing Officer | 1,177,381 | 302,978 | 0 | 52,854 | 0 | 1,533,213 |
| James J. Buettgen, Former Chairman, President and Chief Executive Officer | 0 | 0 | 0 | 0 | 0 | 0 |

- 18 -

CLASS ACTION COMPLAINT

| Name | | | | | | |
|---|---|---|---|---|---|---|
| F. Lane Cardwell, Jr., Former Interim Chief Executive Officer | 0 | 0 | 0 | 0 | 0 | 0 |
| Brett A. Patterson, Former Ruby Tuesday Concept President | 0 | 0 | 0 | 0 | 0 | 0 |
| *Other Executive Officer* | | | | | | |
| Thomas A. Williams, Chief People Officer | 1,110,714 | 273,077 | 0 | 53,025 | 0 | 1,436,816 |
| *Directors* | | | | | | |
| Stephen I. Sadove, Chairman of the Board | 0 | 0 | 0 | 0 | 0 | 0 |
| Mark W. Addicks | 0 | 0 | 0 | 0 | 0 | 0 |
| Donald E. Hess | 0 | 0 | 0 | 0 | 0 | 0 |
| Kevin T. Clayton | 0 | 0 | 0 | 0 | 0 | 0 |
| Jeffrey J. O'Neill | 0 | 0 | 0 | 0 | 0 | 0 |
| Bernard Lanigan, Jr. | 0 | 0 | 0 | 0 | 0 | 0 |

85.    In addition, under the terms of the Merger Agreement, upon the consummation of the Proposed Acquisition, each outstanding Company Option, Company RSU, PSU, or restricted stock award, will, whether vested or unvested, be canceled in exchange for cash equal to the merger consideration.

86.    Significantly, Company insiders including Directors and members of Company management hold thousands of such Company equity wards, for which they will receive large cash payouts not shared amongst Plaintiff and other public stockholders of the Company, as follows:

| Name | Value of Unvested Stock Options ($) | Value of Vested Stock Options ($) | Value of Restricted Stock ($) | Value of RSUs ($) | Value of Phantom Stock Units ($) | Value of PSUs ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| *Named Executive Officers* | | | | | | | |
| James F. Hyatt, II, President and Chief Executive Officer | 0 | 0 | 1,184,374 | 0 | 0 | 0 | 1,184,374 |
| Linda Sue Briley, Chief Financial Officer | 0 | 0 | 0 | 39,259 | 157,894 | 86,388 | 283,541 |
| Michael K. Ellis, Chief Development Officer | 0 | 0 | 0 | 28,795 | 157,894 | 86,388 | 273,077 |
| Rhonda J. Parish, Chief Legal Officer and Secretary | 0 | 0 | 0 | 58,696 | 162,754 | 86,388 | 307,838 |
| Davis W. Skena, Chief Marketing Officer | 0 | 0 | 0 | 58,696 | 157,894 | 86,388 | 302,978 |
| James J. Buettgen, Former Chairman, President and Chief Executive Officer | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| F. Lane Cardwell, Jr., Former Interim Chief Executive Officer | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Brett A. Patterson, Former Ruby Tuesday Concept President | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Other Executive Officer* | | | | | | | |
| Thomas A. Williams, Chief People Officer | | | 0 | 28,795 | 157,894 | 86,388 | 273,077 |
| *Directors* | | | | | | | |
| Stephen I. Sadove, Chairman of the Board | 0 | 0 | | 0 | 0 | 0 | 0 |

CLASS ACTION COMPLAINT

| Name | | | | | | |
|------|--|--|--|--|--|--|
| Mark W. Addicks | 0 | 0 | 0 | 0 | 0 | 0 |
| Donald E. Hess | 0 | 0 | 0 | 0 | 0 | 0 |
| Kevin T. Clayton | 0 | 0 | 0 | 0 | 0 | 0 |
| Jeffrey J. O'Neill | 0 | 0 | 0 | 0 | 0 | 0 |
| Bernard Lanigan, Jr. | 0 | 0 | 0 | 0 | 0 | 0 |

87.     Furthermore, certain employment agreements with several Ruby Tuesday officers or directors are entitled to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them at the very least, hundreds of thousands of dollars, compensation not shared by Ruby Tuesday common stockholders.

88.     The following table sets forth the Golden Parachute compensation for certain Ruby Tuesday directors and officers, as well as their estimated value payable:

| Name | Cash ($)[1] | Equity ($)[2] | Pension/ NQDC ($) | Perquisites/ Benefits ($)[3] | Tax Reimbursement ($) | Total ($) |
|------|------|------|------|------|------|------|
| **Named Executive Officers** | | | | | | |
| James F. Hyatt, II, President and Chief Executive Officer | 850,000 | 1,184,374 | 0 | 0 | 0 | 2,034,374 |
| Linda Sue Briley, Chief Financial Officer | 1,134,047 | 283,541 | 0 | 48,235 | 0 | 1,465,823 |
| Michael K. Ellis, Chief Development Officer | 1,110,714 | 273,077 | 0 | 50,946 | 0 | 1,434,737 |
| Rhonda J. Parish, Chief Legal Officer and Secretary | 1,211,557 | 307,838 | 0 | 53,448 | 0 | 1,572,843 |
| Davis W. Skena, Chief Marketing Officer | 1,177,381 | 302,978 | 0 | 52,854 | 0 | 1,533,213 |
| James J. Buettgen, Former Chairman, President and Chief Executive Officer | 0 | 0 | 0 | 0 | 0 | 0 |
| F. Lane Cardwell, Jr., Former Interim Chief Executive Officer | 0 | 0 | 0 | 0 | 0 | 0 |
| Brett A. Patterson, Former Ruby Tuesday Concept President | 0 | 0 | 0 | 0 | 0 | 0 |
| **Other Executive Officer** | | | | | | |
| Thomas A. Williams, Chief People Officer | 1,110,714 | 273,077 | 0 | 53,025 | 0 | 1,436,816 |
| **Directors** | | | | | | |
| Stephen I. Sadove, Chairman of the Board | 0 | 0 | 0 | 0 | 0 | 0 |
| Mark W. Addicks | 0 | 0 | 0 | 0 | 0 | 0 |
| Donald E. Hess | 0 | 0 | 0 | 0 | 0 | 0 |
| Kevin T. Clayton | 0 | 0 | 0 | 0 | 0 | 0 |
| Jeffrey J. O'Neill | 0 | 0 | 0 | 0 | 0 | 0 |

CLASS ACTION COMPLAINT

| Bernard Lanigan, Jr. | 0 | 0 | 0 | 0 | 0 | 0 |

89.     Finally, the Proxy indicates that all employees of the Company, including Company insiders such as management, will retain their employment for a minimum period of twelve months following the consummation of the Proposed Acquisition.  Said employment contracts can be worth hundreds of thousands or millions of dollars for such high-level Company insiders, further widening the gap between the compensation received by Company insiders compared to public stockholders of the Company.  Moreover, the Proxy is silent as to any plans that NRD has to retain Company management or Company insiders past this one-year date.  Such information is vital knowledge for Plaintiff and other Company stockholders to have in preparation for a vote on the Proposed Acquisition.

90.     Thus, while the Proposed Acquisition is not in the best interests of Ruby Tuesday public stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Proxy***

91.     On October 31, 2017, Ruby Tuesday's filed with the SEC a materially misleading and incomplete Proxy that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Acquisition.

*Omissions and/or Material Misrepresentations Concerning Ruby Tuesday's Financial Projections*

92.     The Proxy fails to provide material information concerning financial projections provided by Ruby Tuesday's management, reviewed with Ruby Tuesday's and relied upon by UBS in its analyses.  For example, the Proxy states that UBS "reviewed certain internal financial information and other data relating to the business and financial prospects of Ruby Tuesday that were not publicly available, including financial forecasts and estimates prepared by the management of Ruby Tuesday that the Ruby Tuesday board directed UBS to utilize for purposes of its analyses" and "performed a discounted cash flow analysis of Ruby Tuesday in which UBS analyzed the future cash flows of

- 21 -

Ruby Tuesday using financial forecasts and estimates prepared by the management of Ruby Tuesday." Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

93. The Proxy references but fails to provide recent projections prepared by the Company or any details regarding revisions made to the recent projections. These recent projections include November 11, 2016, February 6, 2017 and March 7, 2017. The Proxy fails to disclose information related to the: (i) "revised financial projections provided by Ruby Tuesday management dated February 6, 2017, which contained projections that were revised down from the previous financial plan provided on November 11, 2016 to reflect ongoing softness in store performance despite Ruby Tuesday's new initiatives" (Proxy at 31); (ii) "revised financial projections provided by Ruby Tuesday management on March 7, 2017, which contained projections that were further revised down from the previous financial plan provided on February 6, 2017 to reflect ongoing and challenging market conditions in the casual dining industry and the performance of the "Fresh New Garden Bar" initiative" (Proxy at 33); and (iii) and any revisions to the March 7, 2017 projections before Ruby Tuesday management's projections were finalized on May 5, 2017. Proxy at 54.

94. Without accurate projection data presented in the Proxy, Plaintiff and other stockholders of Ruby Tuesday's are unable to properly evaluate the Company's true worth, the accuracy of UBS's financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Acquisition.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Acquisition*

- 22 -

CLASS ACTION COMPLAINT

95.     Specifically, the Proxy fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Acquisition.  In particular, the Proxy fails to disclose:

a.      The Proxy fails to disclose whether any of the 21 confidentiality agreements executed by Ruby Tuesday and the prospective bidders contained standstill and/or "don't ask, don't waive" provisions that are or were preventing those counterparties from submitting superior offers to acquire the Company.  Without this information, stockholders may have the mistaken belief that, if these potentially interested parties wished to come forward with a superior offer, they are or were permitted to do so, when in fact they are or were contractually prohibited from doing so.

b.      As set forth above (¶66), the Company did waive the standstill obligations of Bidders 8 and 11 on August 14, 2017.  Given this conduct, it is likely the remaining agreements referenced in (a) above contained DADW provisions that are still in effect. Moreover, the Merger Agreement contains an Anti-Waiver Provision that contractually prohibits the Board from releasing a party from a previously executed standstill agreement.

c.      The specific nature of UBS's investing banking relationship with NRD, as disclosed to and discussed by the Board in January 2017 or at any other point during the sales process;

d.      The specific breakdown of the amount of strategic and non-strategic third parties that took part in the sales process; and

e.      The specific nature of any employment contracts for current members of Company Management or the Board of Directors to retain their employment after the consummation of the Proposed Acquisition.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses Performed by UBS*

CLASS ACTION COMPLAINT

96.     In the Proxy, UBS describe its fairness opinions and the various valuation analyses performed to render its opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

97.     For example, the Proxy does not disclose material details concerning the analyses performed by UBS in connection with the Proposed Acquisition, including (among other things):

    i.   *Selected Public Companies Analysis*

         The Proxy fails to disclose the following: (i) whether UBS performed any benchmarking analysis for the selected companies; (ii) the individual multiples and metrics for the companies observed by UBS in its analysis

    ii.  *Selected Transactions Analysis*

         The Proxy fails to disclose the following: (i) whether UBS performed any benchmarking analysis for the selected transactions; (ii) the transaction values for the transactions utilized in the analysis; and (iii) individual multiples and metrics for the transactions observed by UBS in its analysis.

    iii. *Discounted Cash Flow Analysis*

         The Proxy fails to disclose the following: (i) the individual inputs and assumptions utilized by UBS to derive the discount rate range of 9.5%-10.5%; (ii) the range of terminal values of Ruby Tuesday; (iii) UBS's basis for applying perpetuity growth rates ranging from 1.5% to 2.5%; and (iv) the definition of after tax, unlevered, free cash flows.

98.     Without the omitted information identified above, Ruby Tuesday's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, Ruby Tuesday's public stockholders cannot gauge the reliability

- 24 -

CLASS ACTION COMPLAINT

of the fairness opinion and the Board's determination that the Proposed Acquisition is in their best interests.

## FIRST COUNT

### Claim for Breach of Fiduciary Duties

### <u>(Against the Individual Defendants)</u>

99. Plaintiff repeats all previous allegations as if set forth in full herein.

100. The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiffs and the Company's public stockholders.

101. By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Ruby Tuesday's.

102. As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of Ruby Tuesday's by entering into the Proposed Acquisition through a flawed and unfair process and failing to take steps to maximize the value of Ruby Tuesday's to its public stockholders.

103. Indeed, Defendants have accepted an offer to sell Ruby Tuesday's at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

104. Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed decision on whether to vote their shares in support of the Proposed Acquisition.

105. The Individual Defendants dominate and control the business and corporate affairs of Ruby Tuesday's, and are in possession of private corporate information concerning Ruby Tuesday's assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Ruby Tuesday's which makes it

CLASS ACTION COMPLAINT

inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

106.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

107.    As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Ruby Tuesday's assets and have been and will be prevented from obtaining a fair price for their common stock.

108.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

109.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## SECOND COUNT

## Violations of Section 14(a) of the Exchange Act

## (Against All Defendants)

110.    Plaintiff repeats all previous allegations as if set forth in full herein.

111.    Defendants have disseminated the Proxy with the intention of soliciting stockholders to vote their shares in favor of the Proposed Acquisition.

112.    Section 14(a) of the Exchange Act provides, "[n]o solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

CLASS ACTION COMPLAINT

which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

113.    The Proxy was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

114.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

115.    The Individual Defendants were at least negligent in filing a Proxy that was materially misleading and/or omitted material facts necessary to make the Proxy not misleading.

116.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of the entitlement to decide whether to vote their shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the vote regarding the Proposed Acquisition.

**THIRD COUNT**

**Violations of Section 20(a) of the Exchange Act**

**<u>(Against all Individual Defendants)</u>**

117.    Plaintiff repeats all previous allegations as if set forth in full herein.

118.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in

- 27 -

connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the Proxy was materially misleading to Company stockholders.

119. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Proxy and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the Proxy. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Proxy before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

120. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Ruby Tuesday's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the Proxy was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Proxy and are therefore responsible and liable for the misrepresentations contained herein.

121. The Individual Defendants acted as controlling persons of Ruby Tuesday's within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Ruby Tuesday's to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Ruby Tuesday's and all of its employees. Additionally, Bass Pro also had direct supervisory control over the composition

- 28 -

of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.  As alleged above, Ruby Tuesday's is a primary violator of Section 14 of the Exchange Act and SEC Rule Proxy.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.      Enjoining the Proposed Acquisition;

C.      In the event defendants consummate the Proposed Acquisition, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

E.      Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Ruby Tuesday's and obtain a transaction which is in the best interests of Ruby Tuesday's and its stockholders;

F.      Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

G.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

H.      Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

- 29 -

CLASS ACTION COMPLAINT

Dated: November 14, 2017

By:    s/**_Paul Kent Bramlett_**
Paul Kent Bramlett #7387
**BRAMLETT LAW OFFICES**
Paul Kent Bramlett #7387/ MS #4291
Robert Preston Bramlett #25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
Tel.: 615.248.2828
Fax: 866.816.4116
E-mail: PKNASHLAW@aol.com
Robert@BramlettLawOffices.com

*Attorneys for Plaintiff*

OF COUNSEL
**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc L. Ackerman
Two Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
Telephone: 610.667.6200
esmith@brodskysmith.com
mackerman@brodskysmith.com

CLASS ACTION COMPLAINT